JANET M. HEROLD
Regional Solicitor
DANIELLE L. JABERG (Cal. Bar No. 256653)
Counsel for ERISA
Office of the Solicitor, U.S. Department of Labor
90 Seventh St., Suite 3-700
San Francisco, CA 94103

BRUCE L. BROWN
Associate Regional Solicitor
EVAN H. NORDBY (Wash. Bar No. 35937)
Trial Attorney
Office of the Solicitor, U.S. Department of Labor
300 Fifth Avenue, Suite 1120
Seattle, WA 98104
Phone (206) 757-6762
Fax (206) 757-6761
Email: nordby.evan@dol.gov

Attorneys for the Plaintiff Thomas E. Perez, Secretary
United States Department of Labor

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor,<br><br>　　　Plaintiff,<br><br>　　　vs.<br><br>CITY NATIONAL CORPORATION, CITY NATIONAL BANK; CITY NATIONAL SECURITIES, INC.; MARIANNE LAMUTT, CHRISTOPHER CAREY, MICHAEL B. CAHILL, MICHAEL NUNNELEE, RICHARD BYRD, VERNON KOZLEN, KATE DWYER, RICHARD L. BLOCH, KENNETH | NO.<br><br>COMPLAINT FOR VIOLATIONS OF ERISA |

**COMPLAINT FOR VIOLATIONS OF ERISA**　　　　　　　**PAGE 1 OF 17**

1  COLEMAN, BRUCE ROSENBLUM,    )
   ROBERT TUTTLE, & the CITY    )
2  NATIONAL CORPORATION         )
   PROFIT SHARING PLAN,         )
3                               )
          Defendants.
4  _____
5
6      Plaintiff Thomas E. Perez, Secretary of Labor, United States
7  Department of Labor (the "Secretary"), alleges:
8                          **JURISDICTION**
9      1.      This action arises under Title I of the Employee Retirement
10 Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001-
11 1191c, and is brought by the Secretary under ERISA §§ 502(a)(2) and (5), 29
12 U.S.C. §§ 1132(a)(2) and (5), to enjoin acts and practices that violate the
13 provisions of Title I of ERISA, to obtain appropriate equitable relief for
14 breaches of fiduciary duty under ERISA § 409, 29 U.S.C. § 1109, and to
15 obtain such further equitable relief as may be appropriate to redress and to
   enforce the provisions of Title I of ERISA.
16     2.      This court has jurisdiction over this action pursuant to ERISA
17 § 502(e)(1), 29 U.S.C. § 1132(e)(1).
18     3.      Venue of this action lies in the Central District of California
19 pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and in the Western
20 Division of this Court, because the City National Corporation Profit Sharing
21 Plan (the "Plan") is and was administered, and the alleged fiduciary breaches
22 took place, within Los Angeles County in this district.
23                      **GENERAL ALLEGATIONS**
24     **A.    Fiduciaries and Parties in Interest**
25
26

**COMPLAINT FOR VIOLATIONS OF ERISA**                    **PAGE 2 OF 17**

4.     The Plan is an employee benefit plan within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA § 4(a), 29 U.S.C. § 1003(a).

5.     At all relevant times, City National Corporation ("Company") was and is a publicly traded financial services company, incorporated in Delaware and with a principal place of business in Los Angeles, California; the parent company of City National Bank; the sponsor, named fiduciary, and Plan Administrator of the Plan; a fiduciary of the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii); and a party in interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

6.     At all relevant times, City National Bank ("CNB") was and is the Trustee of the Plan; a fiduciary of the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii); and a party in interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

7.     At all relevant times, City National Securities, Inc. ("CNS") was and is a wholly owned subsidiary of CNB; a person providing services to the Plan; and a party in interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

8.     At all relevant times, City National Asset Management ("CNAM") was and is a division of CNB; a person providing services to the Plan; and a party in interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

9.     At relevant times, Richard L. Bloch, Kenneth Coleman, Bruce Rosenblum, and Robert Tuttle were members of the Company's and CNB's Boards of Directors' Compensation, Nominating, and Governance Committee

("CN&G Committee"); to whom the Boards of Directors delegated authority for the appointment and monitoring of a Plan Committee to administer the Plan as agent for the Plan Administrator; and were therefore fiduciaries of the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii); and parties-in-interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

10. At relevant times, Marianne Lamutt, Christopher Carey, Michael B. Cahill, Michael Nunnelee, Richard Byrd, Vernon Kozlen, and Kate Dwyer were members of the Plan Committee, renamed the Benefits Committee ("Benefits Committee"), exercising discretionary control, authority and responsibility in the administration, management and disposition of the Plan and its assets; and were therefore fiduciaries of the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii); and parties-in-interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

**B.  The Plan and Administration of the Plan**

11. The Plan is named as a Defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to ensure that complete relief can be granted.

12. The Plan is a 401(k) defined contribution profit sharing plan, funded by employee deferred compensation contributions and Company matching and profit-sharing contributions.

13. Plan participants had three options for directing investment of their Plan accounts:

a.     Option 1, the selection of a custom portfolio from a menu of options composed of mutual funds, collective investment funds as well as the Company Stock Fund;

b.     Option 2, the selection of a predetermined risk-based model portfolios of various money market, bond and stock funds; or,

c.     Option 3, an individually directed brokerage account which allowed the individual to invest in stocks, bonds, mutual funds (including those not specified in options 1 and 2, the Company Stock Fund, and other publicly traded investments;

d.     The accounts of those participants who did not elect any of the options were invested in the Plan's Qualified Default Investment Alternative.

14.     The Plan Document identifies the Company as the Sponsoring Employer, and designates the Sponsoring Employer as the named fiduciary and Plan Administrator.

15.     The Plan Document provides for the Sponsoring Employer to appoint an administrative committee, the Plan Committee, which as agent for the Plan Administrator and subject to the Plan Administrator's approval, has authority to make rules, regulations, interpretations, and calculations to administer the Plan.

16.     The Plan Document also provides for the Plan Committee to direct investment of the Plan's assets, and the authority to delegate responsibilities.

17.     The Boards of Directors of the Company and CNB, acting together, delegated authority for the appointment and removal of Plan Committee members to the CN&G Committee.

18.     The Board's CN&G Committee appointed a Plan Committee, which it renamed the Benefits Committee, and vested the Benefits Committee

with all plan administration powers and duties in the Benefits Committee's charter.

19.     Through the exercise of its authority to appoint members of the Benefits Committee and its power to remove Benefits Committee members, the members of the CN&G Committee had a continuing duty to monitor the Benefits Committee and individuals it appointed to the Benefits Committee.

20.     The Plan's Trust Document grants the Trustee the power to pay "reasonable" Plan administrative expenses out of the assets of the Plan trust, but provides that the Trustee is to be directed in the exercise of that power by the Benefits Committee.

## FIRST CLAIM FOR RELIEF

**Disloyal, Imprudent, and Prohibited Transactions between the Plan and Plan Service Providers CNB and the Company, Who Were Also Plan Fiduciaries**

21.     Paragraphs 1 through 20 above are realleged and incorporated herein by reference.

22.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires plan fiduciaries to act "solely in the interest" of plan participants and beneficiaries.

a.   Subsection (A) of this section requires that the fiduciary act for the "exclusive purpose" of providing benefits to plan participants and defraying reasonable expenses of plan administration. 29 U.S.C. § 1104(a)(1)(A).

b.   Subsection (B) adds the duty of prudence, requiring a plan fiduciary to act with the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

23.     ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits fiduciaries from causing plans to engage in transactions that that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest.

24.     ERISA § 406(b), 29 U.S.C. § 1106(b) prohibits fiduciary self-dealing.

    a.   Subsection (1) provides that a fiduciary shall not "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b), (b)(1).

    b.   Subsection (2) provides that a fiduciary shall not "in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. §§ 1106(b), (b)(2).

    c.   Subsection (3) provides that a fiduciary shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. §§ 1106(b), (b)(3).

25.     Effective April 1, 2000, the Company and CNB entered into a contract under which CNB and its subsidiaries provided services to the Plan in exchange for compensation.

26.     CNB provided trust and administrative services to the Plan through its divisions, including CNB's asset management division, CNAM; and subsidiaries including City National Securities, Inc. ("CNS").

27.     CNB received its compensation for these trust and administrative services from mutual funds held by Plan participants through mutual fund revenue sharing.

28.     Mutual fund revenue, to pay revenue sharing payments, as referenced in Paragraph 26, is generated by regularly deducting money from mutual fund investors' accounts as "expenses."

29.     Both the Company's own proprietary mutual funds, as well as mutual funds managed by other firms but open to Plan participants through the Plan's menu of funds, paid revenue sharing payments to CNB.

30.     In the CNB fee schedules for the Plan, CNB and the Benefits Committee agreed that the payments CNB received via mutual fund revenue sharing would constitute its compensation from Plan participant accounts for the provision of recordkeeping and trust services.

31.     CNB set the amount of its compensation for administering the Plan in the same manner – calculated to earn a profit – as it set its rates for all of its trust and recordkeeping clients; though unlike as to its other clients, CNB owed a fiduciary duty to the Plan and its participants, CNB's own employees.

32.     CNB did not track its direct expenses of providing trust and administrative services to the Plan, and ensure that the Plan paid no more than the reimbursement of direct expenses to CNB via mutual fund revenue sharing.

33.     For example, CNB employees who worked on trust and recordkeeping services for retirement plans, including the Plan, did not track their time on the basis of time spent working on a given plan; nor were any CNB employees dedicated 100 percent of the time to work on behalf of the Plan.

34.     CNB's compensation for its services was approved by the Benefits Committee.

35.     Though members of the Benefits Committee were also salaried employees of CNB, the minutes do not indicate that the Benefits Committee members weighed their individual inherent conflicts of interest in exercising their authority to approve CNB's compensation for Plan services.

36.     Prior to 2008, CNB received revenue sharing from mutual funds included in the Plan under agreements directly with those mutual funds.

37.     Rather than track income generated by its own Plan participants' mutual fund investments separately, in order to compare that income with the Company's direct expenses incurred in providing services to the Plan, CNB tracked mutual fund revenue sharing income by mutual fund family, thereby aggregating the income from investments of Plan participants with the investments of all of its other trust clients and obscuring its profits from providing services to the Plan.

38.     From January 2008 forward, Fidelity Brokerage Services LLC and National Financial Services LLC (collectively, Fidelity), became the custodian of mutual funds for the Plan and all other trust and custodial clients of CNB, by contract with CNB.

39.     After CNB entered into the mutual fund custody agreement with Fidelity, Fidelity received the mutual fund revenue sharing compensation for all those funds in its custody, retained two and a half (2.5) basis points of such mutual fund revenue sharing compensation as its fee, and passed the remainder (approximately 28.5 basis points) to CNB.

40.     Because CNB never tracked its direct expenses attributable to Plan administration, CNB did not (and could not) ever limit the compensation paid to itself from the Plan to reimbursement of actual expenses.

41.     This failure to keep records of direct expenses deprived the Plan of knowing the true cost of services CNB rendered, for the fees it claimed.

42.     Benefits Committee minutes dated February 19, 2008 note that CNB's service fees "may be high for this Plan."

43.     From February 2008 to September 2011, CNB and the Benefits Committee reduced the mutual fund revenue sharing retained by CNB as compensation, but at no point did the Committee ever demand a refund to the Plan from CNB of prior excess compensation paid or that CNB track direct expenses.

44.     At its May 6, 2008 meeting, the Benefits Committee instituted a rebate to Plan participants of 6 basis points going forward, reducing CNB's fees to 26 basis points of Plan assets, but did not seek a rebate back to the Plan of fees already paid to CNB, rebate prior fees in excess of direct expenses, or limit fees going forward to direct expenses.

45.     On April 27, 2009 and again on July 21, 2009, per its meeting minutes, the Committee discussed a review of Plan expenses compared to other plans administered by CNB which found that CNB's fees charged to the Plan were "high" compared to the market.

46.     On July 21, 2009, the Benefits Committee approved increasing the rebate to participant accounts by 2 basis points, to a total rebate of 8 basis points going forward, but did not seek a rebate back to the Plan of fees already paid to CNB, rebate prior fees in excess of direct expenses, or limit fees going forward to direct expenses.

47.     In October 2010, the Company, as Plan sponsor, engaged Mercer Investment Consulting ("Mercer") to conduct a review of the investment structure of the Plan including a review of "investment option expenses against peer universe medians," and ongoing annual monitoring ("Mercer Analysis").

48.     The Mercer Analysis was presented to the Benefits Committee on December 10, 2010, and informed the Benefits Committee that no other company reviewed earned a profit from its own plan, but instead retained only reimbursement for direct expenses under the guidance given by DOL Advisory Opinions 89-09(A)and 93-06(A), each cited in the Mercer Analysis.

49.     The Benefits Committee nevertheless did not seek a rebate back to the Plan of fees already paid to CNB, nor did CNB rebate prior fees in excess of direct expenses.

50.     The Committee members allowed CNB – also a fiduciary – to make a profit from the Plan by causing the Plan to pay more than direct expenses.

51.     Moreover, the Committee members  had a conflict of interest as employees of the Plan sponsor CNB, and failed to expressly consider the potential effect of that conflict of interest on their decision making.

52.     By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan:

a.  Solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

b.  With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and

c.  By causing the Plan to engage in transactions that that they know or should know constitute direct or indirect transfers of the Plans' assets to, or

use of the Plans' assets by or for the benefit of, parties in interest, in violation of ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D); and

d.  By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan dealt with the assets of the plan in his own interest or for his own account in violation of ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1); and

e.  By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan, in his individual or in any other capacity, acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries, in violation of ERISA section 406(b)(2), 29 U.S.C. § 1106(b)(2); and

f.  By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan received consideration for his/its own personal account from any party dealing with the Plan in connection with a transaction involving the assets of the Plan, in violation of ERISA section 406(b)(3), 29 U.S.C. § 1106(b)(3).

As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have suffered losses of approximately $3,500,000 plus lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA section 409, 29 U.S.C. § 1109; ERISA section 502(a)(2), 29 U.S.C § 1132(a)(2); and ERISA section 502(a)(5), 29 U.S.C. § 1132(a)(5).

//
//
//
//
//

## SECOND CLAIM FOR RELIEF

### Disloyal, Imprudent and Prohibited Transactions between the Plan and CNAM, A Division of CNB; and CNS, a Wholly Owned Subsidiary of CNB

53.    Paragraphs 1 through 52 above are realleged and incorporated herein by reference.

54.    The Benefits Committee had the authority to retain brokerage services and investment advisors for the Plan.

55.    Plan Participants who elected the Individually Directed Account ("IDA") investment option were required by the fiduciaries to use CNS as their broker/dealer.

56.    The amount of compensation paid from IDA accounts to CNS was not based on or limited to direct expenses incurred by CNB, but rather, determined based on a 20 percent reduction of standard CNS brokerage commissions and mutual fund transaction fees in addition to a base fees of $150 per participant and an asset-based fee of 0.20 percent of the aggregate net assets.

57.    One Benefits Committee member, Nunnelee, was also President of CNS.

58.    Plan participants who elected the IDA investment option and who wanted to retain an investment advisor were required by the fiduciaries to use CNB's CNAM division as their investment advisor.

59.    The annual CNAM investment advisory fee was not based on or limited to direct expenses, but rather, set at 0.25 percent of the aggregate net asset value.

60.    Direct expenses incurred by CNB's CNAM division and by CNS were not tracked.

61.        By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan:

a.   Solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

b.        With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and

c.        By causing the Plan to engage in transactions that that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest, or by participating as a party-in-interest counterparty to such transactions, in violation of ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D); and

d.        By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan dealt with the assets of the plan in his own interest or for his own account, or by participating as a party-in-interest counterparty, in violation of ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1); and

e.        By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan, in his individual or in any other capacity, acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries, or by participating as a party-in-interest counterparty, in violation of ERISA section 406(b)(2), 29 U.S.C. § 1106(b)(2); and

f.      By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan received consideration for his/its own personal account from any party dealing with the Plan in connection with a transaction involving the assets of the Plan, or by participating as a party-in-interest counterparty, in violation of ERISA section 406(b)(3), 29 U.S.C. § 1106(b)(3).

As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have suffered losses of at least $450,000 plus lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA section 409, 29 U.S.C. § 1109; ERISA section 502(a)(2), 29 U.S.C § 1132(a)(2); and ERISA section 502(a)(5), 29 U.S.C. § 1132(a)(5).

### THIRD CLAIM FOR RELIEF

#### Co-Fiduciary Liability

62.   Paragraphs 1 through 61 are realleged and incorporated by reference.

63.   Pursuant to ERISA sections 405(a)(1), (2) and (3), 29 U.S.C.§ 1105(a)(1), (2) and (3), each Defendant, as a fiduciary, knew of, knowingly participated in, and enabled the breaches of fiduciary responsibility committed by each of the other fiduciaries set forth above.

64.   As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have suffered approximately $4,000,000 in losses plus lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA section 409, 29 U.S.C. § 1109; ERISA section 502(a)(2), 29 U.S.C § 1132(a)(2); and ERISA section 502(a)(5), 29 U.S.C. § 1132(a)(5).

**PRAYER FOR RELIEF**

WHEREFORE, the Secretary prays for judgment:

A.      Ordering Defendants to restore to the Plan any losses, including lost-opportunity costs, resulting from fiduciary breaches committed by them or for which they are liable;

B.      Permanently enjoining Defendants from violating the provisions of Title I of ERISA;

C.      Enjoining Defendants to track the direct expenses incurred by any fiduciary or party-in-interest to the Plan, in the provision of services to the Plan, and certify annually by affidavit that reimbursement from the Plan to any fiduciary or party-in-interest service provider amounts to no more than direct expenses;

D.      Appointing an independent fiduciary to approve and monitor the selection and compensation of service providers to the Plan;

E.      Requiring the Defendants to pay for all costs associated with the appointment and retention of the independent fiduciary;

F.      Requiring the Defendants to cooperate with the independent fiduciary;

G.      Awarding the Secretary the costs of this action;

H.      Awarding post-judgment interest; and

I.      Ordering such further relief as is appropriate and just.

//
//

Dated: _____

M. PATRICIA SMITH
Solicitor of Labor

JANET M. HEROLD
Regional Solicitor

BRUCE L. BROWN
Associate Regional Solicitor, Seattle

DANIELLE L. JABERG
Counsel for ERISA

EVAN H. NORDBY
Trial Attorney

By: /s/ Danielle L. Jaberg
        DANIELLE L. JABERG

Attorneys for Plaintiff
United States Department of Labor